IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

**ENTERED**
**09/19/2011**

|  |  |  |
|---|---|---|
| IN RE | ) | |
| | ) | |
| MORITZ WALK, LP, | ) | CASE NO. 10-41069-H3-11 |
| | ) | |
| Debtor, | ) | |
| | ) | |

<u>MEMORANDUM OPINION</u>

The court has held an evidentiary hearing on confirmation of the "Debtor's Second Amended Plan of Reorganization" (Docket No. 92), as modified by the "Debtor's Proposed Modification to Debtor's Second Amended Plan of Reorganization" (Docket No. 123). The following are the Findings of Fact and Conclusions of Law of the court. A separate Judgment will be entered denying confirmation. To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such. To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

<u>Findings of Fact</u>

Moritz Walk, L.P. ("Debtor") filed a voluntary petition under Chapter 11 of the Bankruptcy Code on December 6, 2010. Rallin Welch, the president of Debtor's general partner, Cooper Welch, LLP, testified that he has managed the Debtor as a debtor in possession in the instant Chapter 11 case.

Debtor originally acquired 3.823 acres of undeveloped land in the Spring Branch area of Houston, Texas in 2007. Debtor paid $3.4 million for the property, financed in part by Redstone Bank, N.A. (which later became Green Bank, N.A.).[1] Welch testified that he and his investors contributed capital of approximately $1 million. Debtor executed a note, payable to Green Bank, and a deed of trust, with respect to the property. (Green Bank Exhibit 10). Glen Bell, Green Bank's executive vice president, testified that, under the note, Green Bank advanced approximately $2,355,000.[2] Green Bank has filed a proof of claim, in the amount of $2,362,943.10, plus continuing taxes, interest, and attorney fees.

Debtor initially platted the property as a 45 unit townhome development. On June 19, 2008, Redstone Bank released its lien as to four of the 45 lots. Debtor, with financing from Sterling Bank, N.A. and Allegiance Bank Texas, constructed four townhomes on the four lots. On the petition date, those four townhomes were leased or held for lease.[3]

---

[1]In order to avoid confusion, the entity is referred to as Green Bank hereafter.

[2]The original principal amount of the note was $3.15 million. Bell testified that the remainder was withheld for construction of infrastructure improvements to the property if Debtor was able to obtain a letter of credit to back the infrastructure construction.

[3]On Sterling Bank's motion, the stay was conditioned as to Sterling Bank. Welch testified that Sterling Bank has foreclosed

Subsequently, Debtor replatted the remainder, approximately 3.65 acres, for 36 townhomes and patio homes.  The land remains raw, with no further construction at this time.

Prepetition, Debtor sought to refinance its note payable to Green Bank.  Debtor sought either a replacement lender to take Green Bank's lien position, or a renewal of the loan with Green Bank.

The parties have differing versions of the course of dealings between Debtor and Green Bank prepetition.  Bell testified that he and Welch frequently corresponded.  Bell testified that Welch continually promised that he would raise the money from investors to prepay interest on the loan, but never brought the money to Green Bank.

Welch testified that Debtor and Green Bank had an agreement for renewal of the note.  Welch testified that, on that the eve of maturity of the note, Green Bank reneged on its agreement, and notified Welch that it intended to foreclose Debtor's interest in the property.

Green Bank posted the property in November, 2010, for a December, 2010 foreclosure.  Debtor filed the petition in the instant Chapter 11 case to stop the foreclosure.

---

as to two townhomes.  He testified that Debtor intends to allow Allegiance Bank to foreclose as to the townhomes in which it has a security interest.

Welch testified that, in addition to the debt owed to Green Bank, Debtor owes approximately $160,000 to RETax Funding, L.P., secured by a tax lien.  He testified Debtor owes various amounts to "various partners in the project."  He testified that Debtor has unsecured debt totaling in excess of $100,000.  He testified that equity security holders have contributed approximately $2 million in capital since the inception of the project.

The instant plan classifies the claims and equity interests into seven classes.  Class 1 contains priority claims and prepetition ad valorem tax claims.  Class 2 contains the secured claim of Green Bank.  Class 3 contains the secured claim of Allegiance Bank Texas.  Class 4 contains the secured claim of Sterling Bank.  Class 5 contains the secured claim of RETax Funding, L.P.  Class 6 contains unsecured claims.  Class 7 contains equity interests.  The plan designates Classes 1 and 5 as not impaired under the plan.

Debtor filed a modification of the plan on August 26, 2011.  The modification changes the treatment of Classes 1, 2, 3, and 4.  The modification designates as unimpaired Class 4.  The modification also adds a paragraph to the plan describing proposed financing.  The modification also adds a paragraph to the plan providing generally that the injunction provision of the plan does not enjoy a creditor from pursuing rights and remedies

against any guarantor of their claims against the Debtor. (Docket No. 123).

Debtor filed a ballot summary with respect to the plan. The summary filed by Debtor indicates that Green Bank voted to reject the plan, in Class 2. Allegiance Bank Texas voted to reject the plan, in Class 3. Sterling Bank did not cast a ballot in Class 4. Sixteen unsecured creditors, representing 17 unsecured claims, voted to accept that plan, in Class 6. No votes were cast in Class 7. (Docket No. 126).

Green Bank (Docket No. 113), Harris County (Docket No. 109), Spring Branch Independent School District (Docket No. 110), Allegiance Bank Texas (Docket No, 111), and Sterling Bank (Docket No. 116) filed objections to confirmation. Prior to the confirmation hearing, Harris County withdrew its objection to confirmation (Docket No. 119). At the confirmation hearing, Spring Branch Independent School District, Allegiance Bank Texas, and Sterling Bank announced withdrawal of their objections to confirmation, leaving Green Bank as the only creditor continuing to object to confirmation.

The proposed plan as modified provides generally for Debtor to commence construction of infrastructure improvements and new townhomes concurrently. It provides that Icon Bank will fund $1.26 million to fund the plan and begin the infrastructure construction. Welch testified that the $1.26 million will be

5

used to pay the claims of RETax Funding, L.P., half the unsecured claims, and administrative expenses of the Chapter 11 case, and prepay one year's interest to Green Bank, with the remainder going to fund construction of the infrastructure.

In the modification, Debtor describes its arrangement with Icon Bank as a "preliminary financing commitment."  Welch testified that Debtor and Icon Bank have prepared a term sheet identifying the terms of Icon Bank's proposed investment.  The term sheet, which was attached to the modification, provides for a one-year loan of $1.26 million, at an interest rate of "7% or greater," with an origination fee of one percent.  The term sheet provides for Icon Bank to have a first lien as to ten lots, a second lien as to the remaining 26 lots, and an Icon Bank CD for $400,000.  The term sheet also requires that the loan be guaranteed by "individuals that meet minimum balance sheet, cash flow and all other credit standards set by Icon Bank."  (Green Bank Exhibit 8).

The modification provides in part:  "In order to obtain the financing commitment from ICON bank, the Debtor has also arranged investment commitments from other private investors that are collateralizing the ICON Bank loan."  (Docket No. 123). Debtor attached to the modification proposed terms for investments by Daniel Dror, president of "International American-

Texas Properties, Inc. and its Affiliated Entities," and Michael J. Frye, president of Bayway Constructors, Inc.[4]

The document signed by Dror provides for Dror or his entities to provide a first lien on property located in League City, Texas, which is stated to be valued at $400,000.  In return, the document provides that Dror is to get a second lien on ten lots, and a lien on the other 26 lots, plus a preferred return of 10 percent based upon attributed equity, and a profit participation of 40 percent of net profits on the first phase (consisting of lot development).  (Green Bank Exhibit 6).

The document signed by Dror bears signature lines for "Hilshire Court, L.P.," and provides that it is signed by "John Riddle, Trustee" and "Rallin Welch, Trustee."  (Green Bank Exhibit 6).

Welch testified that Hilshire Court, L.P. has not been formed.  He testified that he does not know of which trust Riddle purports to have signed on behalf.  He testified that he signed on behalf of a trust created for his children, formed in approximately 2000.

Welch testified that John Riddle (who is not a prepetition equity holder, but has been advising Debtor) introduced Debtor to Icon Bank.  He testified that Icon Bank

---

[4]The proposed financing documents do not indicate whether the individuals or their entities propose to make the investments stated in the documents.

introduced Debtor to Daniel Dror and Michael Frye, customers of Icon Bank.[5]

Welch testified that he has not inspected the property that the document calls for Dror to contribute.  He testified that he is unaware of a federal tax lien against Dror in the amount of $307,938.[6]

The document signed by Frye provides for Frye or his entity to provide $200,000 in cash or cash equivalent, secured by a second lien on ten lots, to be released upon repayment of the investment and a preferred return of eight percent.  The document also provides that Frye is to get a profit participation of 40 percent of net profits on the first phase.  Although the document contains signature lines for "Hilshire Court, L.P.," "John Riddle, Trustee," and "Rallin Welch, Trustee," the document is not signed by Riddle or Welch.  (Green Bank Exhibit 5).

With respect to Green Bank's claim, the proposed plan as modified provides that the claim will be satisfied in exchange for a new two year note, at 4.25 percent interest, in the

---

[5]Welch testified that Riddle was convicted of federal bank fraud.  The judgment of Riddle's conviction, entered on August 6, 1997, is in evidence.  (Green Bank Exhibit 9c).

[6]Counsel for Green Bank approached Welch, during Welch's testimony, with what counsel described as documents related to a federal tax lien against Dror.  Welch, after reviewing the documents, testified that he believes that the tax lien is against Dror, individually, but that he believes Dror's entity will be making the investment.  The documents relating to the federal tax lien, if any, are not in evidence.

original principal amount of Green Bank's prepetition claim, plus interest, post-petition attorney fees and expenses allowed under Section 506 of the Bankruptcy Code, less all post-petition payments that have been paid by the Debtor. The plan provides that, on the effective date, Green Bank retains its lien, but, upon completion of the infrastructure developments, provides that Green Bank will be required to release its lien as to ten lots, "in order to obtain construction financing for the remainder of the project." It provides that Green Bank will be paid "One Hundred Percent of the new lot sale proceeds on Lots 11 through 26." (Docket No. 92).

Section 5.7 of the plan provides, with respect to equity interests, that their interests are extinguished on the effective date of the plan. However, the plan provides that the prepetition equity holders receive a "fifteen percent (15%) carried equity interest in the new entity or a twenty-five percent (25%) carried interest in the Investment Group," on behalf of their prepetition equity interests. The plan provides that the investment group gets an eight percent preferred return, and 35 percent of the net profits from the development. The plan provides that "until all superior classes of claims are satisfied, holders of Class 7 Equity Interests shall not receive or retain distributions or dividends on account of their Equity Interests."

9

Welch testified that the new entity to be formed will have ownership percentages different from those of the existing equity holders of the Debtor.  He testified that he will own approximately 25 percent.  He testified that John Riddle will own a portion of the new entity.  Welch testified that the new investors will own a portion of the new entity.  He testified that he has not determined in what percentages the new investors, Riddle, and any others will own the new entity.

Debtor takes the position that, after the lots are developed with streets, curbs, sewers, and other infrastructure, the value of the lots will be sufficiently enhanced that the value of Green Bank's lien with respect to the 26 lots as to which the plan provides Green Bank retains its first lien and its retained junior lien as to the first ten lots will be greater than the value of Green Bank's lien on the entire property in its present condition.  Welch testified that he believes Debtor will be able to sell out its townhomes or patio homes, for prices between $500,000 and $600,000 each, during the term of the plan.

Both sides presented opinion testimony as to the value of the property.  Welch testified that, in his opinion as a developer, the lots will have a value of $135,000 to $145,000 once they are developed.  In his opinion, the total value of the property is the midpoint of this range, $140,000, multiplied by the number of lots, 36, for a total of $5.04 million.  He

10

testified that he believes the value of the lots as to which Green Bank retains its lien will be approximately $3.5 million, after development.  Welch did not offer an opinion as to the value of the property in its present condition.

In addition, Debtor presented the testimony and report of William R. Murphy, an appraiser.  Murphy analyzed the value of the property based on the comparable sales approach.  Murphy's report indicates that he analyzed three main sales that be believes are comparable.  Sale one, which took place in December, 2009, was a parcel having a size of 42,633 square feet, located at 7716 Bobbitt Lane.  The sale price listed in Murphy's report is $960,000, or $22.52 per square foot.  Sale two, which took place in June, 2009, was a parcel having a size of 42,600 square feet, located at 7819 Bobbitt Lane.  The sale price listed in Murphy's report is $960,000, or $22.54 per square foot.  Sale three, which took place in January, 2011, was a parcel having a size of 30,013 square feet, located at 1117 Silber.  The sale price listed in Murphy's report is $928,000, or $30.92 per square foot.  Murphy adjusted each of the three sales downward by ten percent, because the size of each of the three lots sold was smaller than Debtor's property (identified in Murphy's report as having a size of 158,994 square feet).  Murphy's report states an opinion that the value of the property in its present condition

11

is $21 per square foot, for a total of $3.34 million.  (Debtor's Exhibit 1).

Murphy's report states in part, with respect to Debtor's property:  "The highest and best use of the site once the market indicates that supply and demand factors are at feasible levels would be for possible current or future single family patio lot development and SFR patio home development uses or any other physical possible and legally feasible use."  Murphy testified that he believes townhome development in the area is moving forward.  However, he testified that he has not made an independent study as to the pace of townhome development or the prices of sales of townhomes.  In his testimony, Murphy cited to unspecified news reports indicating that activity is increasing for properties with sale prices in excess of $500,000.

Green Bank presented the testimony and report of Jim Sheppard, an appraiser.  Sheppard analyzed five sales.  Sale one, which took place in March, 2010, was a parcel having a size of 250,470 square feet, located at 34th and Brinkmann.  The sale price listed in Sheppard's report is $2,442,083, or $9.75 per square foot.  Sale two, which took place in June, 2011, was a parcel having a size of 80,652 square feet, located at 601 Strey Lane.  The sale price listed in Sheppard's report is $1,880,000, or $23.31 per square foot.  Sale three, which took place in August, 2007, was a parcel having a size of 50,544 square feet,

located at 8400 Burkhart Road.  The sale price listed in
Sheppard's report is $1,175,000, or $23.25 per square foot.
Sheppard's sale four is the same sale as Murphy's sale two, the
sale of 42,600 square feet, located at 7819 Bobbitt Lane, for
$960,000, or $22.54 per square foot.  Sheppard's sale five is the
same sale as Murphy's sale one, the sale of 42,633 square feet,
located at 7716 Bobbitt Lane, for $960,000, or $22.52 per square
foot.  Sheppard's report adjusts sale one upward by 20 percent
for location, and adjusts sale two down by 15 percent for
location.  It adjusts sales three downward by 15 percent for
market conditions.  It adjusts sales three through five downward
by 15 percent for size.  It adjusts sales two through five upward
by 5 percent for corner/frontage characteristics.  Sheppard's
report states an opinion that the value of the property in its
present condition is $18 per square foot, for a total of $2.86
million.

     Sheppard testified that he adjusted the value of sale
three downward by 15 percent based on market conditions, as
demonstrated by two sales of the same property.  He testified
that, in 2007, the property at 7819 Bobbitt Lane sold for $26 per
square foot, but that in 2009, the property sold for $22.54 per
square foot.

     Sheppard's report states in part:  "Demand for
residential building sites proved to be limited given the lack of

sales activity due to the current market.  Until such time as the economy improves, the success of a residential subdivision is unlikely."

Sheppard testified that the neighborhood in which Debtor's property is located is a transitional neighborhood, separated from a more upscale neighborhood by Westview Street. He testified that the median income for residents of the area north of Westview and south of Long Point, where Debtor's property is located, is half that for residents south of Westview and north of Interstate Highway 10.

Neither Murphy nor Sheppard indicated, either in their testimony or in their reports, any specific information on trends in the value of property in the area or economic factors supporting their conclusions regarding such trends.  Both Murphy and Sheppard testified that it was difficult to find comparable sales, because there have been few sales of comparable property in recent time periods.

<u>Conclusions of Law</u>

Section 1129 of the Bankruptcy Code provides, in pertinent part:

> (a) The court shall confirm a plan only if all of the following requirements are met:
>
> > (1) The plan complies with the applicable provisions of this title.
>
> * * *

14

(8) With respect to each class of claims or interests—

    (A) such class has accepted the plan; or
    (B) such class is not impaired under the plan.

              * * *

(11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

              * * *

(b)(1) Notwithstanding section 510 (a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

(2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

    (A) With respect to a class of secured claims, the plan provides—

        (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

        (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at

least the value of such holder's interest in
the estate's interest in such property;
(ii) for the sale, subject to section 363 (k)
of this title, of any property that is
subject to the liens securing such claims,
free and clear of such liens, with such liens
to attach to the proceeds of such sale, and
the treatment of such liens on proceeds under
clause (i) or (iii) of this subparagraph; or

(iii) for the realization by such holders of
the indubitable equivalent of such claims.

11 U.S.C. § 1129.

Section 1123(a)(5) of the Bankruptcy Code provides:
(a) Notwithstanding any otherwise applicable
nonbankruptcy law, a plan shall—

* * *

(5) provide adequate means for the plan's
implementation, such as—

(A) retention by the debtor of all or any
part of the property of the estate;
(B) transfer of all or any part of the
property of the estate to one or more
entities, whether organized before or after
the confirmation of such plan;
(C) merger or consolidation of the debtor
with one or more persons;
(D) sale of all or any part of the property
of the estate, either subject to or free of
any lien, or the distribution of all or any
part of the property of the estate among
those having an interest in such property of
the estate;
(E) satisfaction or modification of any lien;
(F) cancellation or modification of any
indenture or similar instrument;
(G) curing or waiving of any default;
(H) extension of a maturity date or a change
in an interest rate or other term of
outstanding securities;
(I) amendment of the debtor's charter; or
(J) issuance of securities of the debtor, or
of any entity referred to in subparagraph (B)

16

> or (C) of this paragraph, for cash, for
> property, for existing securities, or in
> exchange for claims or interests, or for any
> other appropriate purpose;

11 U.S.C. § 1123(a)(5).

The plan proponent has the burden of proof as to compliance with Section 1129(a) by a preponderance of the evidence. In re Briscoe Enters., Ltd. II, 994 F.2d 1160 (5th Cir. 1993), cert. den., 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993).

In the instant case, the plan lacks adequate means for its implementation. First, Debtor's proposed postconfirmation capital structure is not clear. Welch has apparently anticipated that a new entity will be formed to hold the equity of the Debtor, but with a capital structure to be determined in his sole discretion, without disclosure to this court or to creditors.[7] This vagueness undercuts the means for the plan's implementation, and also is not consistent with the interests of creditors.

Second, the plan appears to provide for encumbrance or conveyance of more than all of the property of the Debtor. Welch testified that Debtor intends to convey a beneficial ownership of 40 percent of the Debtor's profit to Dror or Dror's designee, and

---

[7] The court notes that this proposed structure apparently includes a role for John Riddle, a felon convicted of bank fraud. While Riddle's participation does not clearly violate any of the provisions of the Bankruptcy Code, it suggests very close scrutiny of the financial arrangements contemplated in the Debtor's plan.

40 percent of the Debtor's profit to Frye or Frye's designee. Welch also stated that he gets 25 percent of the profit, and that an additional portion of the profit will be set aside for Riddle.

Third, the provisions contained in the plan differ materially from those set forth in the purported commitments between the proposed new entity and the proposed investors. The plan provides that the new investors get 35 percent of the profits. The documents signed by Dror and Frye provide for 40 percent each.

Fourth, the plan purports to provide for the conveyance to multiple parties of liens in the same lots, without addressing (other than the priority the plan appears to provide for Icon Bank) the relative priority of the liens to be conveyed to the other parties.

Fifth, the provision for payment of Green Bank's claim depends on the speculative construction and sale of townhomes, at a time when, at best, the reasonable minds of experts differ as to whether townhomes will sell. Moreover, the plan requires that the sales occur over a quick period of time. There is insufficient evidence to support Debtor's contention that there is sufficient demand for townhomes at the price point at which Debtor intends to sell the townhomes (in excess of $500,000) that

the plan will succeed.  The court concludes that the plan does not contain adequate means for its implementation.

In the instant case, several of the impaired classes have not accepted the plan.  Thus, even if there were adequate means for the implementation of the plan, the plan could only be confirmed if it was fair and equitable as to each impaired class that has not accepted the plan.[8]

With respect to Green Bank's claim, the plan does not provide directly for the sale of the property, and does not provide that Green Bank retains its lien in full.  Thus the plan is fair and equitable as to Green Bank only if it provides to Green Bank for the realization of the indubitable equivalent of its claim.

Providing for Green Bank to realize the indubitable equivalent of its claim does not require that Green Bank must participate in any upside potential for later increases in the

---

[8]In light of the withdrawal of its objection, the court will not analyze in detail whether the plan is fair and equitable as to Allegiance Bank Texas.  Additionally, because the class of unsecured claims accepted the plan, the court does not address whether the plan is fair and equitable to the class of unsecured claims.  Green Bank argues that the plan violates the "absolute priority rule."  Although there is some support for the notion that a secured creditor can assert a violation of the absolute priority rule, see In re Pacific Lumber Co., 584 F.3d 229 (5th Cir. 2009), where the class of unsecured creditors has voted to accept the plan, the Bankruptcy Code's requirement that a plan be fair and equitable as to a class of secured creditors does not require that the plan meet the absolute priority rule.  See In re Superior Offshore Intern., Inc., 591 F.3d 350 (5th Cir. 2009).

property's value.  In re Pacific Lumber Co., 584 F.3d 229 (5th Cir. 2009).  In Pacific Lumber, noteholders whose claims were to be paid in cash the proceeds of sale to a specified bidder at a judicially-determined price under the plan objected on grounds the plan deprived them of the opportunity to foreclose and credit bid.  The Fifth Circuit held that the cash payment was the indubitable equivalent of their claim.

Courts generally have not approved plans calling for a secured creditor to receive less than the property securing its claim, over the objection of the creditor.  The Fifth Circuit noted in Pacific Lumber that examples of indubitable equivalence "focus on what is really at stake in secured credit: repayment of principal and the time value of money."  Pacific Lumber, 584 F.3d, at 246.

In the instant case, the repayment of principal to Green Bank is dependent on the speculative sale of townhomes. Debtor has not met its burden of proof on the issue of whether the plan provides for Green Bank to realize the indubitable equivalent of its claim.

Likewise, on the question of whether confirmation of the plan is likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, Debtor has not met its burden of proof.  Virtually the only evidence addressing this

question is the self-serving testimony of Welch.  The appraisers did not address market absorption of townhomes or townhome lots, other than to note that there are very few data points because there have been very few sales recently.

The court concludes that Debtor has not met its burden of proof to show that the plan has adequate means for its implementation, is not likely to be followed by liquidation or the need for further financial reorganization, and is fair and equitable as to Green Bank.  The court concludes that the plan cannot be confirmed.

Based on the foregoing, a separate Judgment will be entered denying confirmation of the "Debtor's Second Amended Plan of Reorganization" (Docket No. 92), as modified by the "Debtor's Proposed Modification to Debtor's Second Amended Plan of Reorganization" (Docket No. 123).

Signed at Houston, Texas on September 19, 2011.


LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE